******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SHARA ROCCO ET AL. *v.* ABDULHAMID
D. SHAIKH ET AL.
(AC 39774)

Keller, Elgo and Bright, Js.

*Syllabus*

The plaintiff homeowners, S and P, brought an action, seeking, inter alia,
to quiet title to certain real property owned by S pursuant to statute
(§ 47-31) and to discharge an allegedly invalid lien pursuant to statute
(§§ 49-13 and 49-92e). The plaintiffs and the defendants had executed
a contract for the sale of the property, but disagreements arose and
the defendants refused to complete the purchase. The plaintiffs then
executed a contract with a different buyer for the purchase and sale of
the property. Before the plaintiffs could close on that sale, the defendants
filed in the land records a copy of their sales contract with the plaintiffs,
which the new buyers claimed constituted a cloud on the title of the
property and precluded them from purchasing the property. After the
defendants were defaulted for failing to comply with an order of the
court to file an answer, a hearing in damages was held. Thereafter, the
trial court rendered judgment in favor of the plaintiffs, from which the
defendants appealed to this court. The trial court then granted the
plaintiffs' motion to lift the appellate stay in part so that the plaintiffs
could market and sell the property free and clear of the defendants'
claims or encumbrances. Subsequently, the court denied the defendants'
motion to open and vacate the judgment, in which they had claimed
that the plaintiffs lacked standing to bring the statutory causes of action
because S had transferred her interest in the property to herself as the
trustee of a trust before the trial court rendered judgment. On appeal
to this court, the defendants claimed, inter alia, that the plaintiffs' lack
of standing deprived the trial court of subject matter jurisdiction over
the plaintiffs' statutory causes of action. *Held*:

1. The defendants' claim that the plaintiffs lacked standing to maintain their
statutory causes of action sounding in quiet title and discharge of a lien
was moot, as there was no practical relief that this court could afford
the defendants; the parties conceded that the property has been sold
and title has vested in a third party, there was no indication that the
court awarded attorney's fees under either of those counts of the com-
plaint, the defendants conceded that they have no legal or equitable
right or interest in the property, and the defendants did not explain how
the transfer of the property affected the plaintiffs' standing to pursue
their other causes of action for slander to title, tortious interference
and breach of contract, all of which had accrued prior to the plaintiffs'
transfer of title.

2. This court declined to exercise its supervisory authority over the adminis-
tration of justice to reverse the trial court's judgment, which the defen-
dants claimed was procured by fraud; the traditional protections
available to the defendants through constitutional, statutory and proce-
dural limitations were not inadequate so as to warrant the exercise of
this court's supervisory powers.

Argued March 19—officially released September 18, 2018

*Procedural History*

Action, inter alia, to quiet title to certain real property,
and for other relief, brought to the Superior Court in
the judicial district of New Britain, where the action
was withdrawn in part; thereafter, the court, *Young,
J.*, issued an order requiring the defendants to file an
answer; subsequently, the court defaulted the defen-
dants; thereafter, the court, *Abrams, J.*, denied the
defendants' motion to set aside the default; subse-
quently, the defendants filed a counterclaim; thereafter,

the court, *Wiese, J.*, granted the plaintiffs' motion to strike the counterclaim; subsequently, following a hearing in damages, the court, *Hon. William M. Shaughnessy, Jr.*, judge trial referee, rendered judgment for the plaintiffs; thereafter, the court, *Hon. William M. Shaughnessy, Jr.*, judge trial referee, issued an amended judgment, from which the defendants appealed to this court; subsequently, the court, *Hon. William M. Shaughnessy, Jr.*, judge trial referee, granted the plaintiffs' motion to partially terminate the appellate stay, issued a clarification of the judgment, and denied the defendants' motion to open and vacate the judgment. *Affirmed.*

*Jon L. Schoenhorn*, with whom, on the brief, were *Kathryn A. Mallach* and *Magdalena Narozniak*, law student intern, for the appellants (defendants).

*Garrett S. Flynn*, for the appellees (plaintiffs).

*Opinion*

KELLER, J. The defendants, Abdulhamid D. Shaikh and Rukaiyabanu A. Shaikh, appeal from the judgment of the trial court rendered in favor of the plaintiffs, Shara Rocco and Patrick Rocco. On appeal, the defendants claim that (1) the plaintiffs lacked standing to maintain their causes of action because Shara Rocco transferred her interest in the subject property to a trust before the court rendered judgment; (2) the court lacked subject matter jurisdiction over count two of the plaintiffs' complaint because the statutory grounds on which the plaintiffs relied did not apply to the type of lien at issue in the present case;[1] and (3) we should exercise our supervisory authority over the administration of justice to reverse the judgment because it was procured by fraud, both by the plaintiffs and by the defendants' former attorney. We affirm the judgment of the trial court.

The following procedural history is relevant to the present appeal. In November, 2015, the plaintiffs commenced the underlying action against the defendants. In their six count complaint, dated October 29, 2015, the plaintiffs alleged that, prior to the dissolution of their marriage, they resided at 124 Steeple View Drive in the Kensington section of Berlin (property), and that Shara Rocco was the record owner of the property. The plaintiffs further alleged: "As part of the divorce process, the [plaintiffs] agreed to sell the [property] and divide the net proceeds of the sale. The [plaintiffs] agreed that until the [property] was sold, [Patrick Rocco] would be responsible for certain expenses associated with the [property], including real estate taxes, utilities, maintenance fees and insurance. . . .

"The [plaintiffs] were motivated to sell the [property], not only to obtain the sale proceeds, but also to stop having to incur further carrying costs. The [plaintiffs] were eager to show the [property] in the spring and summer, which is customarily regarded as the best time to sell [property] in Connecticut. . . . [They] listed for sale the property through a real estate agent. Numerous potential buyers expressed interest in purchasing the property. . . .

"On or about April 6, [2015], the [plaintiffs'] real estate agent showed the property to the [defendants]. On the same day, the [defendants] made an offer to purchase the property at a price lower than the asking price. The [defendants] expressly said that their offer was to purchase the [property] 'as is,' which is understood in the real estate business to mean that the sellers would not offer reductions in the selling price based on conditions with the house or property. . . .

"In the weeks following April 6, [2015], the [plaintiffs] and the [defendants] negotiated the price for the property. During those discussions the [defendants]

repeated their offer to purchase the [property] 'as is.'
. . .

"On or about April 15, 2015, the [plaintiffs] and the [defendants] agreed upon a purchase price of $577,500. . . . The [plaintiffs] agreed to accept the [defendants'] offer not only because of the price, but also because the [defendants'] offer lacked many contingencies often found in real estate contracts. . . . As memorialized in the contract for the purchase and sale of the property . . . the [defendants] agreed to purchase the [property] for cash . . . the [defendants] did not condition their purchase . . . on the sale of their existing house . . . and, as discussed repeatedly during the discussions leading up to the execution of the . . . contract, the [defendants] agreed to purchase the [property] 'as is.' "

The plaintiffs further alleged that the parties' contract, executed on April 15, 2015, conspicuously included language that the property was being sold "as is" and that the contract permitted the defendants to terminate the contract in the event that an inspection revealed any serious issues with the property. That provision of the contract, however, provided that the defendants' right to terminate expired if it was not exercised within twenty-four days of the signing of the parties' contract.

Additionally, the plaintiffs asserted: "On or before May 5, 2015, the [defendants] forwarded to the [plaintiffs'] real estate agent a copy of a home inspection report. The [defendants] asked for a price reduction based on issues purportedly found by the inspector and set forth in the report. . . . The real estate agent reminded the [defendants] that they agreed to purchase the [property] on an 'as is' basis and that there would be no reduction in the price based on issues set forth in the report. The [defendants] responded and said that they understood. . . .

"On May 11, 2015, after a week of the [defendants'] repeated requests for credits (which the real estate agent rejected), the [defendants] agreed that their deposits [with the real estate agent totaling $10,000] became firm (i.e., nonrefundable) because the May 9 termination deadline had passed. The [defendants] said that they were moving forward with the purchase."

Prior to the closing on June 2, 2015, "historically significant rainstorms" moved through the area where the property was located, thereby resulting in the accumulation of water on the property. "Members of the [defendants'] family visited the property for a walk-through on the morning of June 2. Just hours after the walk-through, the defendants told the real estate agent that they would not close on the property on that day and that the [defendants] would not purchase the property unless the plaintiffs reduced the purchase price of the [property] based on purported 'drainage issues.'

Later in the day, the [defendants] demanded that the price of the [property] be reduced by $17,500 on account of the purported drainage issues. . . .

"The [defendants] persisted in this demand even though they were reminded that the property was being sold 'as is' and that even if drainage issues were relevant to the sale price (which they were not), no water entered the house and the wet area drained within twenty-four hours of the historically significant rainstorm . . . ."

Relying on the "as is" provision of the contract, the plaintiffs declined to deviate from the contract's terms, and the defendants have refused to purchase the property "as is" for the agreed upon purchase price memorialized in the contract. The plaintiffs also contended that, until the defendants repudiated the contract, they were ready, willing, and able to convey the property to the defendants for the agreed upon price of $577,500, less deposits already received.

In addition to suffering damages in the form of lost proceeds from the sale of the property for the purchase price set forth in the contract, the plaintiffs alleged that they continued to bear the expenses associated with owning the property, including expenses related to taxes, utilities, insurance, maintenance, attorney's fees, and mortgage charges. The plaintiffs attempted to mitigate their damages by relisting the property for sale. In this regard, they alleged: "New buyers . . . offered to purchase the property, and on August 25, 2015, the [plaintiffs] and the new buyers executed a contract for sale for the property . . . . [The contract with the new buyers] obligated the [plaintiffs] to convey title in fee simple to the new buyers, free of any liens. . . . Before the [plaintiffs could close on the sale of the property to the new buyers, the [defendants] caused a copy of [the contract entered into by the plaintiffs and the defendants] to be recorded in the Berlin land records . . . . When the new buyers' counsel performed a title search on the property . . . counsel discovered the [defendants'] filing. On or about September 29, 2015, the new buyers' counsel told the [plaintiffs'] agent that the [defendants'] filing constituted a cloud on the title of the property that precluded the new buyers from purchasing the property. Among other things, the new buyers' title insurance company refused to insure the property because of the [defendants'] land records filing. . . .

"The [plaintiffs], through counsel, made diligent, good faith efforts to attempt to have the [defendants] remove the [defendants'] land records filing from the Berlin land records. These included repeated communications to the [defendants'] counsel and offering additional inducements that the [plaintiffs] were not obligated to make. On or about September 11, 2015, the [plaintiffs'] counsel notified the [defendants] in writing

that the [defendants'] land records filing constituted an improper cloud on the title to the property and sent to the [defendants'] counsel a document for the [defendants'] execution that would release the [defendants'] land record filing from the Berlin land records."

The plaintiffs further alleged that the defendants consistently have refused to remove the filing from the land records and have indicated that they intend to encumber the plaintiffs' property. As a result of the filing, the plaintiffs asserted that they have suffered damages, "including the lost opportunity to sell the property to the new buyers," as well as the varied expenses related to their continued ownership of the property.

Relying on the foregoing factual allegations, the plaintiffs set forth six causes of action. In count one, the plaintiffs sought to quiet title under General Statutes § 47-31. They alleged that Shara Rocco acquired fee simple title to the subject property on November 14, 2013, and that she held title to the property. In relevant part, the plaintiffs asserted: "Shara Rocco seeks a declaration that her ownership interest in the property is unaffected by the [defendants'] land records filing and that the [defendants'] land records filing fails to establish any estate, interest, or encumbrance on the property."

In count two, the plaintiffs sought to discharge an invalid lien under General Statutes §§ 49-13 and 49-92e. They alleged that the defendants' land records filing "is an improper and invalid encumbrance on the property," and that the defendants wrongfully have refused to release the filing. The plaintiffs sought "a judicial declaration that the [defendants'] land records [filing] is invalid, plus an award of costs, attorney's fees, statutory and actual damages, and other damages as to which the [plaintiffs] are entitled."

In count three, sounding in "slander to title," the plaintiffs alleged in relevant part that the defendants' land records filing "is a false statement" that is meant to convey that the defendants have a legal or equitable interest in the property and that it has prevented the plaintiffs from selling the property. The plaintiffs alleged in relevant part that the defendants are acting in a "wilful, wanton, and malicious" manner by not removing the land records filing, and that they are doing so in an effort to coerce the plaintiffs to submit to "unjustified demands for inspection related adjustments" to which they are not entitled under the contract. The plaintiffs alleged that the defendants' conduct toward them was not the result of an innocent mistake.

In count four, which sounds in tortious interference, the plaintiffs incorporated the previous allegations and further alleged in relevant part that after the plaintiffs and the new buyer entered into a valid contract on

August 25, 2015, the defendants, on that same date, made the filing on the land records "for the malicious purpose of causing [Shara Rocco's] contract with the new buyers to terminate, which it in fact did as a direct and proximate result of the [defendants'] wrongful conduct." Moreover, the plaintiffs alleged that "[t]he [defendants] know that Shara Rocco wants to sell the property . . . but cannot do so because of the [defendants'] land record[s] filing." They allege that these facts establish that the defendants tortiously interfered with their actual and prospective contractual rights.

In count five, the plaintiffs alleged that the defendants' actions were in violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The plaintiffs, however, subsequently withdrew this count of their complaint.

In count six, which sounds in breach of contract, the plaintiffs alleged in relevant part that the defendants repudiated the parties' contract, the plaintiffs appropriately treated the repudiation as a default, and the plaintiffs are entitled under the contract to retain deposits made by the defendants as liquidated damages to compensate them for the defendants' conduct in breaching the contract.

In their prayer for relief, the plaintiffs requested compensatory damages, consequential damages, common-law punitive damages, common-law attorney's fees, prejudgment and postjudgment interest, and any further relief that the court deemed just and proper. They also sought statutory damages under § 42-110a et seq., but they later withdrew that request.

On November 13, 2015, pursuant to Practice Book § 17-20, the plaintiffs filed a motion requesting that the defendants be defaulted for failing to appear. On November 20, 2015, the motion for default was granted. Represented by counsel, the defendants did not file an appearance until January 11, 2016. At that time, they also filed a motion to dismiss the action. On March 24, 2016, the court denied the defendants' motion to dismiss.

On April 26, 2016, pursuant to Practice Book § 17-32, the plaintiffs filed a motion for default for failure to plead. Thereafter, on May 3, 2016, the defendants filed a motion for an extension of time in which to plead. The court motion for default was denied, and the court ordered that any answer or responsive pleading be filed on or before May 12, 2016, and that the trial would be held on June 1, 2016. On June 2, 2016, the court ordered that the defendants had to file an answer prior to noon on June 6, 2016, and that the trial in the matter was rescheduled to June 30, 2016. Thereafter, over the plaintiffs' objection, the court granted the defendants additional time in which to file their answer. Upon motion of the defendants, the court granted the

defendants a "final extension" of time in which to plead, until 4 p.m., on June 24, 2016. On June 24, 2016, the defendants filed a request to revise totaling eighty-five pages. The court rejected the filing under Practice Book § 10-7 and ordered the defendants to file an answer by 5 p.m., on June 28, 2016.

The defendants did not file a responsive pleading. On June 29, 2016, the plaintiffs filed a motion requesting that the defendants be defaulted for their failure to plead and that the trial, scheduled for June 30, 2016, be converted into a hearing in damages. The court held a hearing on the plaintiffs' motion, following which it entered a default against the defendants for failing to comply with its order. The court scheduled a hearing in damages for July 6, 2016. On June 30, 2016, the plaintiffs filed a certificate of closed pleadings. On July 5, 2016, the defendants moved to set aside the default. The court denied the motion and sustained the plaintiffs' objection.

The hearing in damages took place on July 20, 2016. On that day, the defendants filed a three count counterclaim against the plaintiffs, sounding in breach of contract, misrepresentation, and specific performance. On July 28, 2016, the plaintiffs moved to strike all counts of the counterclaim. On September 13, 2016, the court granted the motion to strike.

On September 28, 2016, the court rendered judgment in favor of the plaintiffs. The court subsequently amended and clarified its judgment to reflect that, as against both defendants, the court awarded monetary damages in favor of the plaintiffs in the amount of $30,996.22, plus attorney's fees in the amount of $60,862. It also awarded postjudgment interest at 5 percent. The court found that Shara Rocco was the record owner of the property at issue as of July 20, 2016, and that neither defendant had any right, title, or interest in the property or any portion thereof. Further, in addition to its $91,858.22 award of monetary damages in favor of the plaintiffs, the court ruled that the defendants' $10,000 deposit, which had been given to the real estate agency that represented the parties in connection with the sale of the property, was to be delivered to the plaintiffs. The defendants filed the present appeal on November 1, 2016.

On November 30, 2016, the plaintiffs filed a motion for a partial termination of the appellate stay, which, on December 7, 2016, the trial court granted in order to permit the plaintiffs to market and sell the subject property free and clear of any claims or encumbrances by the defendants. The defendants sought review of that order, which this court granted, but we denied the relief requested.[2]

On December 28, 2016, the defendants filed a motion to open and vacate the judgment of the trial court.[3] In

the motion, which was opposed by the plaintiffs, the defendants raised claims of lack of standing and fraud. Specifically, the defendants alleged that Shara Rocco falsely had represented to the court that, during the pendency of the litigation, she was the record owner of the subject property despite the fact that, on March 14, 2016, she transferred all of her interest in the property to a trust. The defendants contended that Shara Rocco committed fraud by her false representations and that the plaintiffs lacked standing once Shara Rocco transferred her interest in the subject property to herself as trustee of the trust. The plaintiffs opposed the motion and submitted an affidavit from Shara Rocco in which she averred in relevant part that she had executed the transfer purely on the basis of advice from an estate planning attorney and that she was unaware that this transfer constituted "a sale" of the property to anyone other than herself. She further averred that she had since conveyed the property back to herself. On March 8, 2017, following a hearing and argument on the motion, the court denied the defendants' motion in a one sentence memorandum of decision.[4] Additional facts will be set forth as necessary.

## I

### SUBJECT MATTER JURISDICTION

First, we address the defendants' claim that the trial court lacked subject matter jurisdiction over one or more of the plaintiffs' causes of action due to the plaintiffs' alleged lack of standing. In their first claim on appeal, the defendants argue that because Shara Rocco transferred her interest in the subject property before the court rendered judgment, the plaintiffs had no standing to maintain their causes of action.

The defendants argue in relevant part: "Prior to the entry of default against the defendants, trial in damages, and for many months after entry of judgment, until its discovery by defense counsel, the plaintiffs withheld the fact that [the] plaintiff Shara Rocco executed a quitclaim deed in March, 2016, transferring all interest in the [subject] property to a living trust. The plaintiffs did not record the deed in the Berlin land records until after the July 20, 2016 trial, and just before judgment entered in September, 2016. Shara Rocco falsely stated under oath at the trial and in an affidavit that she personally was the 'sole owner' of the property when, in fact, she was not.

"The defendants submit that because neither plaintiff possessed title to the property at the time of the trial or entry of judgment, they lacked standing to adjudicate most of their claims, thereby depriving the court of jurisdiction to adjudicate them in their favor." (Emphasis omitted.) We conclude that this claim is moot, and, therefore, we do not have subject matter jurisdiction to adjudicate it; there is no practical relief we can afford

to the defendants in relation to counts one and two of the plaintiffs' complaint because the property has been sold to a third party.

The following additional facts are relevant to the present claim. The plaintiffs presented evidence, in the form of a deed signed by Patrick Rocco, that Shara Rocco acquired title to the subject property after Patrick Rocco transferred his interest in the property to her by means of a quitclaim deed on November 7, 2013. Moreover, just prior to the trial on July 20, 2016, the plaintiffs submitted "affidavits of damages" to the court, including an affidavit in which Shara Rocco averred that she was the sole owner of the subject property and had "not deeded the property to anyone else." During the hearing in damages, Shara Rocco testified that she currently owned the subject property and that she wanted the court to quiet title in her favor.

As the defendants correctly observe, after the court rendered judgment in the plaintiffs' favor, the plaintiffs asked the court to clarify that Shara Rocco was the "sole record owner" of the subject property. The court amended its judgment to reflect that Shara Rocco was "the record owner" of the subject property and that neither defendant had any right, title, or interest in the subject property.[5]

After the defendants filed the present appeal, the plaintiffs filed a motion to terminate the appellate stay in part, which the trial court granted by partially lifting the stay to permit the plaintiffs to market and sell the subject property free and clear of any claims from the defendants. The parties agree that the plaintiffs, thereafter, sold the property to a third party and that the defendants have neither a legal nor equitable interest or right in the property.

In their December 28, 2016 motion to open and vacate the judgment, filed after the defendants brought the present appeal, the defendants relied on the fact that, on March 14, 2016, prior to the hearing, Shara Rocco transferred her interest in the subject property, did not apprise the court or the defendants of this fact, and did not record the transfer on the land records until September 22, 2016. Attached to the defendants' motion was a March 14, 2016 quitclaim deed executed by "Shara C. Rocco also known as Sharon C. Rocco" in favor of "Sharon C. Rocco, Trustee of the Sharon C. Rocco Living Trust Agreement . . . ." The defendants argued that because Shara Rocco no longer had a personal interest in the property after March 14, 2016, and because neither the Shara C. Rocco trust nor its trustee have ever been parties to the present case, the plaintiffs' controversy had become moot due to the plaintiffs' lack of standing, and, thus, the court lacked subject matter jurisdiction.

In opposing the defendants' motion, the plaintiffs

argued in relevant part that the defendants engaged in misconduct that caused the plaintiffs to incur substantial damages, not only in terms of their lost opportunity to sell the subject property, but in the carrying costs they continued to incur until and through the hearing in damages. The plaintiffs argued: "When the plaintiffs filed suit in this action (in November, 2015), it is undisputed that Shara Rocco had both legal and record title to the [subject] property. It is also undisputed that well before this action was filed, the plaintiffs had agreed in their divorce court filing to sell the property and to absorb the carrying costs associated with the property until it could be sold. Thus, both plaintiffs had a direct pecuniary interest in seeing the false lien removed so the property could be sold.

"It is also undisputed that as of the date of the hearing in damages (July 20, 2016), [Shara] Rocco was the record title owner of the property. At the hearing, [Shara] Rocco authenticated and introduced the deed from the Berlin land records, which showed how she acquired title to the property."

The plaintiffs argued that they demonstrated their entitlement to the monetary damages, as well as the liquidated damages to which they were entitled under the purchase and sale agreement, specifically, the $10,000 deposited with the real estate agency. The plaintiffs argued that the court properly determined that the defendants had no interest in the property or any portion thereof. They further argued in relevant part: "The defendants' motion is based on a single document—a deed in which [Shara] Rocco conveyed the property to herself as trustee for a revocable trust (for which she was both trustee and beneficiary) for no consideration. The [defendants'] motion confirms that the deed was not recorded until September, 2016—long after the hearing in damages. At the time she testified, [Shara] Rocco did not have the deed in mind. . . . What [Shara] Rocco did recall was that the malicious lien filed by the defendants was preventing her from selling the property as required by the filed settlement agreement in her divorce case."[6] (Citation omitted.)

Additionally, the plaintiffs argued: "Here, it is undisputed that at the time of the bringing [of the] action and through the hearing in damages, plaintiff Shara Rocco was the legal and record owner of the property. It is also undisputed that at all material times both plaintiffs were contractually and judicially obligated to sell the property and were incurring carrying costs until they could do so. Both plaintiffs had a direct pecuniary interest in seeing that the lien was removed so that the property could be sold and carrying costs could stop running. Ownership of property at the time of the initiation of the action, plus a contractual obligation to clear title, is sufficient to establish standing to maintain a quiet title action, even if the plaintiff [Shara Rocco]

conveys the property during the pendency of the action."[7] The plaintiffs argued that they, therefore, had a direct pecuniary interest in bringing the action and in maintaining the action, which interest continued until and through the date of judgment. The plaintiffs argued that Shara Rocco's unrecorded deed was not relevant to the issues before the court.

Further, the plaintiffs also argued that the defendants failed to demonstrate how the unrecorded deed executed by Shara Rocco in any way deprived the plaintiffs of standing to pursue claims related to breach of contract, tortious interference, and slander to title, which claims were based on the defendants' repudiation of the contract that formed the basis of their invalid lien and which clearly accrued prior to the execution of the deed to the trust. The plaintiffs argued that the defendants had failed to bring to the court's attention any facts that would have changed its ruling on the central decision in the case related to the defendants' interest in the property. Following the hearing on the motion, the court, on March 8, 2017, issued a one sentence memorandum of decision stating that the motion to open and vacate the judgment was denied.

Initially, we observe that the defendants' claim regarding the plaintiffs' lack of standing is unclear with respect to a key issue. Specifically, in their principal appellate brief, the defendants argue that the plaintiffs "lacked standing to adjudicate *most of their claims . . . .*" (Emphasis added.) They then go on to further limit the scope of their claim to the plaintiffs' causes of action "to quiet title and remove liens" on the subject property, as set forth in counts one and two of the plaintiffs' complaint. They also argue that "[a]t the date of the transfer, the trust became the owner of the property, and only the trust, acting through a trustee, had the right to assert its interest in clear title." In their reply brief, however, the defendants argue that it is "abundantly clear that the plaintiffs maintained no personal financial interest in the property, and therefore no standing to pursue *any* of their claims, both at the time default entered and at the hearing in damages." (Emphasis in original.) The defendants do not explain, however, how the transfer of the subject property in March, 2016, would affect the plaintiffs' standing to pursue the causes of action for slander of title, tortious interference, and breach of contract, all of which had accrued prior to the transfer of title. Rather, they present argument only with respect to the counts to quiet title and to discharge the defendants' lien.

In their appellate brief, the plaintiffs respond that the defendants' claim that they lack standing involves only counts one and two of their complaint, and that the defendants' claim is moot because there is no practical relief that can be afforded to them because the property now has been sold and title vested in a third party.

During oral argument before this court, the defendants' attorney was asked whether the lack of standing claim also involved other counts of the complaint, and counsel stated that the claim did not implicate other counts. Shortly thereafter, the panel asked counsel why this issue was not moot, and counsel responded that attorney's fees may have been awarded under these counts. Pressed further, the panel then commented that it appeared that the plaintiffs sought attorney's fees only under the contract and common law, rather than under statutory law. The defendants' counsel responded: "That is correct, Your Honor."

Although we are mindful that the plaintiffs requested "costs, attorney's fees, statutory and actual damages" in the second count of their complaint, a request for statutory damages is not included in the prayer for relief except a request pursuant to § 42-110a, which later was withdrawn.

The plaintiffs also submitted their own affidavits, and the affidavits of their attorneys, in support of their claims for damages and attorney's fees. Additionally, the plaintiffs submitted a proposed judgment in which they requested that the court render judgment in their favor against the defendants with the following damages (plus interest):

"Monetary Damages other than
Attorney's Fees:                              $30,996.22

"Attorney's Fees (authorized by contract,
and as common-law punitive damages, and
in the case of Attorneys [Robert A.] Feiner
and [Dara P.] Goings, on the foregoing bases
and as damages proximately caused by the
recording of the purported lien):            $60,862

"Costs of Suit:                               $1782.24"

The plaintiffs did not allege a right to attorney's fees under any statute or under counts one and two of their complaint. The defendants did not file a motion or a memorandum in opposition.

The court, thereafter, awarded the plaintiffs $30,996.22 in damages and $60,862 in attorney's fees, with no award of costs, with postjudgment interest at a rate of 5 percent.

Having thoroughly examined the record, and having taken into consideration counsels' appellate briefs and arguments, we conclude that the defendants' claim that the plaintiffs lacked standing to maintain their statutory causes of action under counts one and two of their complaint, sounding in quiet title and discharge of a lien, are moot; there is no practical relief we could afford the defendants because title to the subject property already has vested in a third party. Further, there is no indication in the record that the court awarded attorney's fees under either the first or second count

of the plaintiffs' complaint.

"Mootness is a threshold issue that implicates subject matter jurisdiction, which imposes a duty on the court to dismiss a case if the court can no longer grant practical relief to the parties. . . . Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because of a change in the condition of affairs between the parties. . . . [T]he existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Pryor* v. *Pryor*, 162 Conn. App. 451, 455, 133 A.3d 463 (2016); see also *Morgan* v. *Morgan*, 139 Conn. App. 808, 811–12, 57 A.3d 790 (2012) (plaintiff's sale of real property to nonparty during pendency of appeal rendered moot her challenge to order requiring sale of property because sale could not be undone). Here, the parties concede that the property has been sold to a third party, and the defendants concede that they have no legal or equitable right or interest in the property. This court, therefore, lacks jurisdiction to entertain the defendants' claims concerning the causes of action to quiet title and to discharge the lien. There is no practical relief we could afford the defendants, as a third party now has legal title to the property.

## II

### FRAUD

The defendants next claim that this court should exercise its supervisory authority over the administration of justice and reverse the trial court's judgment because the judgment was procured by fraud, both by the plaintiffs and by the defendants' former attorney. The defendants argue that the trial court failed to address their fraud allegations, and, therefore, we should address these allegations under our supervisory authority. They argue that because the "fraud impacts at least count one (action to quiet title), count two (action to discharge invalid liens), and count three (slander to title), remand is necessary to determine whether and to what extent the misconduct tainted the entire judgment, requiring reversal."[8] They also argue that the fraud committed by their former attorney resulted in the default that was rendered against them in this case.[9]

The plaintiffs respond that we have no record to ascertain whether the trial court fully considered and then rejected the defendants' allegations of fraud by the plaintiffs and on what ground the court may have rejected the allegations that fraud affected the judgment. They contend that the defendants specifically raised a claim of fraud against the plaintiffs in their

motion to open the judgment, and the court denied that motion, in a one sentence written opinion, *after a hearing.* They argue that, at most, we should review the court's denial of the defendants' motion to open the judgment, using the abuse of discretion standard, but maintain, nonetheless, that the defendants have failed to provide an adequate record for review of the denial of the motion to open.[10] We decline the defendants' invitation to exercise our supervisory powers in this instance.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Generally, cases in which we have invoked our supervisory authority for rule making have fallen into two categories. . . . In the first category are cases wherein we have utilized our supervisory power to articulate a procedural rule as a matter of policy, either as [a] holding or dictum, but without reversing [the underlying judgment] or portions thereof. . . . In the second category are cases wherein we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal. . . . In other words, in the first category of cases we employ only the rule-making power of our supervisory authority; in the second category we employ our rule-making power and our power to reverse a judgment. . . .

"[T]he salient distinction between these two categories of cases is that in one category we afford a remedy and in the other we do not. . . . In the second category of cases, where we exercise both powers under our supervisory authority, the party must establish that the invocation of our supervisory authority is truly necessary because [o]ur supervisory powers are not a last bastion of hope for every untenable appeal. . . . In almost all cases, [c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the [appellant] and the integrity of the judicial system. . . . [O]nly in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts will we exercise our supervisory authority to reverse a judgment. . . . In such a circumstance, the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *In re Daniel N.*, 323 Conn. 640, 645–48, 150 A.3d 657 (2016).

In this case, we are unable to conclude that traditional protections available to the defendants were not and are not adequate, thereby warranting the rare and extreme exercise of our supervisory powers.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Because we conclude that the defendants' claim that the plaintiffs lacked standing to maintain their causes of action under counts one and two of the complaint is moot, we need not reach the merits of the second claim on appeal, which also addresses count two of the complaint.

[2] There is no dispute that the property, thereafter, was sold to a third party.

[3] Alternatively, the defendants asked the court to consider the motion as a writ of audita querela because the defense arose postjudgment and, therefore, could only be raised postjudgment. "A writ of audita querela affords a remedy to a defendant against whom judgment has already been rendered." *TD Banknorth, N.A.* v. *White Water Mountain Resorts of Connecticut, Inc.*, 133 Conn. App. 536, 547 n.10, 37 A.3d 766 (2012). The court considered and denied the defendants' motion to open and vacate judgment on its merits and, therefore, did not explicitly address this request.

[4] The defendants did not ask the court for a detailed decision setting forth its analysis regarding the court's denial of the motion to open. See Practice Book § 64-1. They also did not amend their appeal to include the trial court's denial of their motion to open.

[5] The defendants concede that they "possess no current legal or equitable interest or right to the property . . . ."

[6] Attached to their opposition to the defendants' motion, the plaintiffs presented an affidavit of Shara Rocco in which she averred in relevant part that she transferred her interest in the property to the trust as part of her estate planning, that she did not understand this action to constitute "a sale" of the property or a conveyance to anyone other than herself, and that she did not receive any consideration for this conveyance. Moreover, she averred that during the foregoing proceedings in this matter, she was motivated to sell the property and believed that she owned the property. She also averred that the property subsequently was transferred back to her.

[7] On appeal, the plaintiffs argue that this sufficiently establishes that they were classically aggrieved, despite the fact that Shara Rocco temporarily had transferred the property to the trust.

[8] We already have concluded that any claim regarding counts one and two is moot for the reasons set forth in part I of this opinion.

[9] The allegation that the fraudulent acts committed by the defendants' former attorney was the cause the default judgment against them and a judgment in favor of the plaintiffs was not raised by the defendants in their motion to open the judgment.

[10] We do not review the merits of the court's denial of the defendants' motion to open the judgment on the basis of fraud because the plaintiffs did not appeal from that judgment, which was rendered *after* the filing of the present appeal. See footnote 4 of this opinion.